William HINTON, Plaintiff,

v.

**TEAMSTERS LOCAL UNION NO. 891, and United Parcel Service, Inc., Defendants.**

No. EC91–43–S–D.

United States District Court, N.D. Mississippi, E.D.

April 16, 1993.

**940**

Bennie L. Jones, West Point, MS, for plaintiff.

Samuel Morris, Agee, Allen, Godwin, Morris & Laurenzi, Memphis, TN, for defendant Teamsters.

Kenneth E. Milam, Watkins and Eager, Jackson, MS, for defendant UPS.

## OPINION

SENTER, Chief Judge.

In this case, plaintiff alleges that his former employer, defendant United Parcel Service, Inc. (UPS), terminated his employment in violation of the collective bargaining agreement and that the defendant union, Teamsters Local Union No. 891 (Union), violated its duty of fair representation. Plaintiff also charges UPS with racial discrimination under Title VII. Presently before the court are defendants' motions for summary judgment and the Union's motion to strike jury demand.[1]

## FACTS

The plaintiff, William Hinton, a black male, first began working for UPS in 1978. At the time of his discharge on June 1, 1990, Hinton was a UPS package driver in Columbus, Mississippi, a position he had enjoyed since 1981. Throughout his time with UPS, Hinton was disciplined on numerous occasions for a variety of reasons.[2] In particular, on March 20, 1990, UPS issued him the following warning letter:

> On 2/1/90, 2/9/90, 3/5/90 and 3/13/90 United Parcel Service received complaints on you from customers dissatisfied with your actions.
>
> This can not and will not be tolerated.
>
> Hopefully this written warning will be sufficient in correcting this problem to avoid further disciplinary action up to/and including discharge.

Although Hinton routinely protested the issuance of such warnings, he did not pursue the Union grievance procedures on this occasion.[3]

Matters worsened on May 24, 1990, when Hinton failed to deliver over 100 packages (possibly as many as 200), many of which were undelivered from the day before, including several "Next Day Air" packages. Consequently, he was relieved of duty pending an investigation and subsequently discharged "due to gross negligence resulting in missed air and ground package service to U.P.S. customers causing customer complaints." Although Hinton acknowledges that he was charged with responsibility for delivering all packages on his package car and that he did not fulfill that responsibility on the day in question, he denies that this was a failure on his part or that it was his fault. Specifically, Hinton charges that his package care was misloaded by a substitute preloader, that he had additional stops added to his delivery route, and that he had a bad relationship with one of the UPS supervisors.[4]

---

1. At oral argument, the court granted UPS's motion to strike jury demand on the Title VII claim; therefore, it need not be addressed here. Plaintiff also named as defendants in this action "John Doe Unions 1 through 5 and John Does 1 through 5 and John Doe Corporations 1 through 5." As plaintiff has failed to supply the court with the names of these "John Doe" defendants (and therefore no attempt at service of process has been made on them), the court has no other recourse but to dismiss them.

2. Because of language in the Collective Bargaining Agreement governing this action, the court is concerned primarily with only the later of these disciplinary actions. *See* Exhibit 52 to Deposition of William Hinton (Aug. 29, 1991), "National Master United Parcel Service Agreement," Art. 49 ("The Employer shall not discharge nor suspend any employee without just cause, but in respect to discharge or suspension shall give at least one warning notice of a complaint against such employee to the employee, in writing.... The warning notice ... shall not remain in effect for a period of more than nine (9) months from date of said warning notice").

3. On the occasions when Hinton did protest disciplinary actions against him, Bobby Hannah, the Union's business agent, assisted him in presenting his grievances. Hinton testified in his deposition that on each of these occasions, Hannah adequately represented his interests and often was successful in getting disciplinary actions reduced or reversed.

4. Hinton even goes so far as to blame others for losing his keys on the day in question and for lying to a UPS employee, in the presence of a customer, about the reason certain next day air packages were delivered late.

Thereafter, Hinton filed a grievance, pursuant to Article 48 of the Collective Bargaining Agreement, protesting UPS's actions. Union Business Agent Bobby Hannah assisted Hinton in this task and in investigating UPS's charges. The parties agree that although Hannah interviewed various UPS officials about the circumstances surrounding Hinton's discharge, he did not interview any customers who had allegedly complained about Hinton's service. Hinton argues that UPS barred him from its Columbus facilities, thereby precluding him from reviewing his personnel records and from interviewing witnesses himself, and that Hannah told him not to interview customers in his absence. In response, Hannah maintains that he arranged a meeting in Columbus with Hinton for the purpose of interviewing customers, a meeting which Hinton failed to attend. Hinton denies this was the purpose of the proposed meeting but admits missing it (although the two gentlemen did meet later that same day in Jackson, Mississippi).

As is the usual procedure, a local hearing concerning Hinton's grievance was first held in Columbus. In attendance were Hinton, Hannah, and various UPS representatives. At this meeting, Hinton, with Hannah's assistance, presented his 47–page grievance. Although Hannah requested that Hinton be reinstated, the grievance was not settled at this meeting.

The failure to settle the matter informally at the local level necessitated the presentation of Hinton's grievance to the Southern Conference Area Parcel Grievance Committee (SCAPGC), which is designated in the Collective Bargaining Agreement as the body that hears employee grievances.[5] Again, Hannah was present and assisted Hinton at this hearing. The record of this proceeding clearly reveals that although neither Hannah nor Hinton presented witnesses or witness statements, Hannah fielded questions from the panel and responded at length to various charges made by UPS throughout the course of SCAPGC proceedings. At the conclusion of the hearing, the panel asked Hinton if he felt he had been properly represented by the Union and Hannah; Hinton replied, "As far as I can see, yes, I have." The SCAPGC hearing resulted in a deadlock, and the grievance was thereafter referred to the Deadlock Panel. In August, 1990, the Deadlock Panel met and, based on the record derived from the SCAPGC hearing,[6] voted unanimously to deny Hinton's grievance. The instant action ensued charging the Union with a breach of its duty of fair representation and UPS with a breach of the collective bargaining agreement and racial discrimination.

## DISCUSSION

### I.

In *DelCostello v. Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the United States Supreme Court held that an individual employee may bring suit against his employer for breach of a collective bargaining agreement. *DelCostello*, 462 U.S. at 163, 103 S.Ct. at 2289. He likewise may bring suit against his union, for although an employee is ordinarily bound by the grievance and arbitration procedures, an exception is available when an employee can prove that the union representing him acted in a "discriminatory, dishonest, arbitrary, or perfunctory fashion...." *Id.* at 164, 103 S.Ct. at 2290. When this occurs, the union is said to have breached its duty of fair representation. *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). The popular term for such claims is a "hybrid § 301/fair representation" claim because it combines two inextricably interdependent claims: The claim against the employer rests on § 301 of the Labor Management Rela-

---

**5.** The SCAPGC is composed of three Union representatives and three UPS representatives and is empowered to determine whether good cause exists for disciplinary action by UPS, up to and including discharge. A decision by a majority of the SCAPGC is binding upon all parties. If the SCAPGC is unable to reach a decision, the matter goes to the Deadlock Panel. A grievance goes to arbitration only if it cannot be resolved by a majority decision of either the SCAPGC or the Deadlock Panel.

**6.** Hannah testified in his deposition that the Deadlock Panel considers only the SCAPGC record and does not allow the presence of the grievant or any other representative unless new evidence is to be presented.

tions Act (29 U.S.C. § 185), since the employee is alleging a breach of the collective bargaining agreement, while the claim against the union rests on a breach of the duty of fair representation, which is implied under the National Labor Relations Act. *DelCostello*, 462 U.S. at 164, 103 S.Ct. at 2290.

■ Under *DelCostello*, the employee has the right to "sue one defendant, and not the other; but the case he must prove is the same whether he sues one, the other, or both." *Id.* at 165, 103 S.Ct. at 2291. To prevail against either the union or the employer, the employee must prove two things: (1) that the union breached its duty of fair representation, *and* (2) that he was discharged by the employer in violation of the collective bargaining agreement. *Id.; see also Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570–71, 96 S.Ct. 1048, 1059–60, 47 L.Ed.2d 231 (1976). Because the issue of fair representation is the "indispensable predicate" to an action against the employer, *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 62, 101 S.Ct. 1559, 1564, 67 L.Ed.2d 732 (1981); *see also Barrett v. Ebasco Constructors, Inc.*, 868 F.2d 170, 172 (5th Cir. 1989), the court begins with a consideration of whether the Union breached its duty to plaintiff.

### A.

■ The duty of fair representation imposes on the Union "a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca*, 386 U.S. at 177, 87 S.Ct. at 910. More succinctly, a union's breach of the duty of fair representation occurs only when a union's conduct toward a member is "arbitrary, discriminatory, or in bad faith." *Id.* at 190, 87 S.Ct. at 916. Although the duty includes an obligation to investigate an employee grievance and to ascertain its merit, *Turner v. Air Transport Dispatchers' Association*, 468 F.2d 297, 299 (5th Cir.1972), the union is "given certain latitude in resolving how the investigation and processing of a grievance is to be conducted," *Hart v. National Homes Corp.*, 668 F.2d 791, 794 (5th Cir.1982), and

"the failure of a union to process an employee's grievance ... does not necessarily give rise to a breach of the duty of fair representation." *Seymour v. Olin Corp.*, 666 F.2d 202, 208 (5th Cir.1982).

Because the "union representative is not a lawyer and he cannot be expected to function as one," *Freeman v. O'Neal Steel, Inc.*, 609 F.2d 1123, 1127 (5th Cir.), *cert. denied* 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980), plaintiff cannot make the requisite showing of bad faith or arbitrariness "merely by proof that the underlying grievance was meritorious," *Vaca*, 386 U.S. at 195, 87 S.Ct. at 919, or that the Union's conduct in handling his grievance was negligent, careless, inadvertent, or mistaken. *Coe v. United Rubber Workers*, 571 F.2d 1349, 1350–51 (5th Cir. 1978). "The legal question is not whether the employee is satisfied with the representation (although the fact that one expresses satisfaction is relevant), or whether it was perfect. Basic fairness is the test...." *Hart*, 668 F.2d at 794. *See Amalgamated Association of·Street, Electric Railway and Motor Coach Employees v. Lockridge*, 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed.2d 473 (1971) (distinguishing between "honest, mistaken conduct, on the one hand, and deliberate and severely hostile and irrational treatment, on the other").

### B.

■ In this case, plaintiff does not allege that the Union handled his grievance in bad faith or in a hostile manner. Rather, he seizes on the arbitrariness factor, charging that Hannah's failure to "call any witnesses or present any affidavits supporting [his] position" could lead a jury to find that his "position was seriously prejudiced, and that the process was subverted thereby."

The court is not persuaded by this argument. Perhaps, in hindsight, Hannah could have done more in investigating plaintiff's grievance, but that is not the touchstone of a claim that the Union's duty of fair representation has been breached. Hannah is not an attorney and cannot be held to the same standard of care to which an attorney is held. The record clearly reveals that Hannah was quite familiar with plaintiff and his disciplin-

ary record and had, on several occasions, successfully represented plaintiff in processing prior grievances. Hannah was also aware of the problems plaintiff was having with the substitute pre-loader and advised plaintiff how to handle it. During the entire time that plaintiff's grievance was moving through the administrative pipeline, he spoke with plaintiff periodically and kept him apprised of the progress of his grievance. Moreover, Hannah attended two of the three grievance proceedings with plaintiff (he was not allowed to attend the Deadlock Panel proceeding) and on each occasion pled for plaintiff's reinstatement.[7] These actions are not illustrative of arbitrary and perfunctory treatment by the Union, but rather have been found by the Fifth Circuit to be compelling evidence of good faith and a lack of perfunctory treatment. *See Connally v. Transcon Lines,* 583 F.2d 199, 203 (5th Cir. 1978).

Furthermore, plaintiff never complained about Hannah's perceived failure until he received an adverse ruling on his grievance. The SCAPGC panel clearly gave plaintiff the opportunity to criticize Hannah's representation and divulge the grounds for his dissatisfaction. Plaintiff knew at that point that Hannah had not presented witnesses or affidavits which supposedly would have supported his version of the events leading up to his discharge. It would certainly have been an easy matter for plaintiff to have told the panel then that he had asked Hannah to investigate UPS's allegations of customer complaints, that Hannah had not followed up on this request, that Hannah had instructed him not to pursue these matters by himself,[8] and that UPS had barred plaintiff from its premises, thereby "thwarting [his] ability to investigate his case." But plaintiff did not do so. Nor has plaintiff now offered, in opposition to these motions, the secret contents of this "omitted evidence." He has only presented what he "anticipates" the interviews would have revealed.

In this case, plaintiff has raised (if anything at all) little more than a mere scintilla of evidence that the Union breached its duty of fair representation. This, of course, is insufficient to survive summary dismissal. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

### C.

■ Having found no breach on the part of the Union, the court need not consider whether UPS discharged plaintiff unlawfully. However, assuming *arguendo,* that the Union did breach its duty of fair representation, the court is of the opinion that UPS did not violate the Collective Bargaining Agreement when it discharged plaintiff. The Agreement requires just cause and a prior written warning before UPS can discharge an employee. UPS issued plaintiff several written warnings within the nine months preceding his discharge. Of importance is the warning dated March 20, 1990, which apprised plaintiff of repeated customer complaints. Interestingly, plaintiff did not protest its issuance. Even after accepting plaintiff's contention that outside forces converged that day to create the disastrous circumstances leading to his termination, several facts remain firmly established by plaintiff's own testimony: Plaintiff alone was responsible for loading next day air packages on his car and for delivering them; his failure timely to deliver those packages resulted in UPS's having to refund certain moneys to its customer(s); and when asked why he was late in delivering those packages, he lied to a UPS employee in the presence of a customer. Although "just cause" is not defined in the Agreement, the court is of the opinion that no reasonable juror could find that UPS did not have just cause for discharging plaintiff.

As there is no genuine issue of material fact on the hybrid § 301/fair representation claim, and defendants are entitled to judgment as a matter of law, the motion for

---

7. The fact that Hannah did not utilize the services of a job steward during any of these proceedings lends no support to plaintiff's claim of unfair representation.

8. That plaintiff chose not to interview UPS customers without Hannah's presence, as allegedly instructed by Hannah, illustrates, in this court's view, the faith that plaintiff placed in Hannah's ability to represent him fairly.

summary judgment on this claim is well taken and is granted.

## II.

Finally, plaintiff has charged UPS with racial discrimination. He argues that the gravamen of the Title VII claim is UPS's discharge of [him]. The acts immediately preceding his discharge form the basis of his discrimination claims. No other non-minority drivers were subjected to the same unrealistic demands UPS placed on [him] which ultimately resulted in his termination.

The individual instances [of discrimination], which [sic] actionable in themselves, are not the basis for the complaint. They are advanced merely as evidence of other disparate treatment by UPS, which ultimately resulted in the final disparate treatment complained of—discharge.

■ Assuming that plaintiff's EEOC charge was timely filed (which UPS vehemently protests), the court is of the opinion that plaintiff has not raised a genuine issue of material fact on his claim of racial discrimination. When faced with a properly supported motion for summary judgment, a non-movant, such as plaintiff, cannot merely "sit back and wait for trial." *Page v. DeLaune,* 837 F.2d 233, 238 (5th Cir.1988). In this context, he must come forward with affirmative evidence creating a factual issue on his claim that he was treated differently because of his race. This he has not done. Even when pressed by this court at oral argument for some kind of evidence to support this claim, plaintiff's counsel was unable to provide the court with any aid. At the least, plaintiff should have provided the names of non-minority drivers who were not discharged under the same or similar circumstances, or who were not subjected to time studies or additional stops on their routes or substitute pre-loaders. The court has meticulously combed the record for some shred of evidence to support plaintiff's allegations, but the evidence is not there.[9] Plaintiff's attempts to create a genuine issue of material fact suggest only an " 'attenuated possibility

that a jury would infer a discriminatory motive,' " *Thornbrough v. Columbus & Greenville Railroad Co.,* 760 F.2d 633, 645 n. 19 (5th Cir.1985) (citation omitted), on the part of UPS in discharging plaintiff. Furthermore,

> [a] party against whom summary judgment is sought cannot raise a fact issue simply by "asserting a cause of action to which state of mind is a material element. There must be some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim."

*Clark v. Resistoflex Co., A Division of Unidynamics Corp.,* 854 F.2d 762, 771 (5th Cir. 1988) (citation omitted). In this case, the " 'possibility of a jury drawing a contrary inference sufficient to create a dispute as to a material fact does not reify to the point even of a thin vapor capable of being seen or realized by a reasonable jury.' " *Amburgey v. Corhart Refractories Corp.,* 936 F.2d 805, 814 (5th Cir.1991) (citation omitted). Therefore, the motion for summary judgment on plaintiff's Title VII claim is granted.

## CONCLUSION

As there is no genuine issue of material fact on either the hybrid § 301/fair representation claim or the Title VII claim, and defendants are entitled to judgment as a matter of law, the court finds the motions for summary judgment are well taken and are granted. The Union's motion to strike plaintiff's jury demand is moot in light of this ruling.

An appropriate order shall issue.

### ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT, ETC.

Pursuant to an opinion filed contemporaneously herewith, it is ORDERED:

That the motion of defendant Teamsters Local Union No. 891 for summary judgment is granted;

That the motion of defendant United Parcel Service, Inc. for summary judgment is granted;

---

9. Plaintiff was even replaced by a black driver.

That the motion of Teamsters Local Union No. 891 to strike jury demand is moot;

That defendants "John Doe Unions 1 through 5," "John Does 1 through 5," and "John Doe Corporations 1 through 5" are dismissed;

That this cause is dismissed with prejudice, with plaintiff to bear all costs.

SO ORDERED.